UNITED STATES of America,
Plaintiff,

v.

**205.03 ACRES OF LAND, MORE OR LESS, Situate IN WARREN COUNTY, STATE OF PENNSYLVANIA, and Clifford Halftown et al., Defendants.**

UNITED STATES of America,
Plaintiff,

v.

**266.13 ACRES OF LAND, MORE OR LESS, Situate IN WARREN COUNTY, STATE OF PENNSYLVANIA, and James G. Pierce et al., Defendants.**

UNITED STATES of America,
Plaintiff,

v.

**268.17 ACRES OF LAND, MORE OR LESS, Situate IN WARREN COUNTY, STATE OF PENNSYLVANIA, and Norma Patterson et al., Defendants.**

Civ. A. Nos. 1137–1139 Erie.

United States District Court
W. D. Pennsylvania.

March 2, 1966.

Gustave Diamond, U. S. Atty., for the Government.

John H. Stewart, Warren, Pa., Benjamin C. Perreault, Salamanca, N. Y., John H. McLaughlin, Erie, Pa., for landowners.

WILLSON, District Judge.

In these three civil actions in which a new trial motion has been denied, the issue remains as to the distribution of the money awarded the Indian owners for the taking of these lands for the construction of the Allegheny River Reservoir commonly known as the Kinzua Dam. Appendix 1 is attached hereto. This is an excerpt taken from a History of Northwestern Pennsylvania, Vol. I, by Joseph Riesenman, Jr., and published by Lewis Historical Publishing Co., Inc. This excerpt is convenient as it details the subject matter of the dispute. The question before me is whether Gibson Pierce was the legitimate son and heir of Chief Marsh Pierce. If so, the moneys to be paid by the United States for the taking of these Cornplanter lands are to be divided among 5 lines of descent. If not, then there are 4 lines of descent. This Court has to squarely decide an issue which is the subject of a 100 year old dispute among Chief Cornplanter's heirs.

Evidence on this issue was taken in open Court. The record made in the Warren County Orphans' Court at

No. 18 Dec. Term 1908 in re—Petition for Partition—has been introduced in evidence. On behalf of the heirs of Gibson Pierce, reliance is made exclusively on the County Court Record. Evidence also has been offered by those who claim the Gibson Pierce heirs should not participate in this distribution. They all agree that an Indian woman named Cassandra Silverheels was the mother of Gibson Pierce, also known as Gibson Dalson. The issue is whether Marsh Pierce fathered Gibson or whether some other Indian did. It has been a never-ending subject of controversy among Marsh Pierce heirs. The County Court heard many witnesses pro and con on this subject and concluded after hearing living witnesses that Gibson was Marsh Pierce's son. I have examined the evidence taken before the County Court and agree that the evidence which supports the finding made by that Court should prevail in this Court. It should be emphasized that the decision here is based on my reading of the evidence before the County Court, and I am not adopting the finding of the County Court per se. Objection has been made to the introduction of the record not on the ground of lack of authenticity, but on the ground that the County Court ultimately determined for itself that it had no jurisdiction as to the issue presented to it. Therefore, it is urged that its record should not be accepted in this Court. However, it seems to me that McCormick on Evidence covers this subject, Section 235, commencing at p. 497, regardless of whether or not it was finally determined by the County Court that it should not pursue the matter to final adjudication. The present parties are descendants of the parties who litigated this matter commencing 58 years ago. The issue is the same. The witnesses before the Court in 1908 are dead. The requirements as outlined in McCormick on Evidence, Chapter 26, p. 480, are met. The witnesses were placed under oath and were cross-examined. The parties were the then owners of the property and the identity of issues in the older case

and this case is the same. Of course, the witnesses are unavailable. For some 16 years at least the County Court thought it had jurisdiction. I am not sure at this date that it did not. It must be remembered that the land is privately owned by individual Indians, as it was then. It was not a question of distribution or sale of the land to other than Indians. It was a proceeding brought to determine an Indian heir. As this Court reads the decision, the County Court ultimately stepped aside from the litigation because it felt it could not enforce any decree. But it was not a glaring usurpation of judicial power, and the proceedings before it were regular, and its record is a reliable one. The federal law favors the admissibility of evidence. See Rule 43. I consider the evidence adduced before the County Court to be the only evidence which has probative value on this question. The evidence before me was by witnesses who were unfamiliar with the times and the evidence being discussed here. It was glaringly evident that their testimony depended on whether they were lined up for or against the Gibson Pierce heirs. For instance, Mrs. Rogene Pierce, a woman 79 years of age, testified that she and her whole family were always against recognition of Gibson as an heir of Marsh Pierce. She said that this subject had caused her grief and suffering as a child. As a little girl when her Father had cash and she needed clothing, his answer to her always was that the money had to go to the lawyers in Warren in order to continue the litigation against Gibson. Another witness—James Pierce—testified that one of the Marsh Pierce heirs who appeared in Court was a complete stranger to him, as he was never recognized as a member of the family. Thus, the witnesses on this issue now available to testify could present no credible evidence on this issue, nor could the exhibits which were offered. Obviously the so-called family record presented by Rogene Pierce showed alterations. The only reliable evidence on the point at issue here is that which comes from the testimony of the wit-

nesses in the 1908 County Court proceeding.

An acceptable summary of that evidence shows that Marsh Pierce made several trips from Cornplanter Town across the line into New York State to the Cattaraugus Reservation. The purpose of these trips was to see an Indian woman, Cassandra Silverheels, who lived on that reservation. In the spring of 1856, when Marsh Pierce returned to Cornplanter, he brought Cassandra with him and lived there as man and wife. A boy was born to Cassandra in the fall of 1856. This boy Marsh Pierce acknowledged to be his son shortly after his birth. The marriage of Marsh and Cassandra was subsequently solemnized according to the white man's law, but the two had lived together as man and wife from the spring of 1856 and continued to so live until the death of Cassandra several years later. The crux of the dispute as to whether the boy, who was named Gibson, was Marsh's son apparently arose because Cassandra had lived with a man named Jake Dalson previous to meeting with Marsh or even perhaps afterward.

The boy Gibson was known sometimes as Gibson Dalson. But this Court concludes from the evidence taken before the County Court that Marsh acknowledged the boy as his own son and heir and continued to do so throughout his, Marsh's, lifetime. As indicated, this issue as to whether Gibson was the son of Marsh Pierce has divided the Pierce family from the date of the boy's birth 110 years ago. The dispute has been bitter and is irreconcilable insofar as the heirs are concerned. The best that can be done now in regard to the distribution of these moneys is to abide by the preponderance of the evidence offered by witnesses in 1908, who at that time were elderly, but remembered the events of the past. Insofar as this Court is concerned, the statute requires that this Court make distribution to "persons entitled thereto." 40 U.S.C.A. § 258a. Upon consideration of all the evidence, this Court is persuaded to hold that the heirs of Gibson Pierce are entitled to share in the distribution. When the distribution of the moneys is made, the Government will proceed accordingly. It is so ordered.

APPENDIX I

"However, by an Act of May 29, 1908, Congress specifically gave the Cornplanter heirs the right to bring actions in the circuit courts of the United States to recover possession of lands or to quiet titles. I have not been able to find that any action has been brought under this; but I am confident that, if and when the Cornplanter heirs get their financial wind, Oil City will be theirs, or they will know the reason why.

"The third tract is the present Cornplanter Grant in Warren County, which is now the permanent home of only about forty of the Cornplanter heirs living there near their Seneca friends and relatives on the Allegheny Reservation just over the New York state line. There are, however, nearly 550 persons with an interest in this property, whose legal status is most peculiar. The patent issued to Cornplanter, and his heirs and assigns, was like all others and conveyed the same title, except that he was not required to perfect it by settlement or payment. However, when Warren County was organized in 1819 for judicial purposes, taxes were assessed against the Grant and on one occasion the sheriff went to collect. He was received in silence in Cornplanter's house. Around the walls stood thirty of the chief's young men, each with a rifle. No word was said; but the sheriff was a smart man and could take a hint. The annoyance continued and notes were extracted from the chief which he probably thought settled the matter. When he learned that they only made it worse, he appealed once more to his old

friend the governor of Pennsylvania. The response was handsome. Under date of April 2, 1822, the Legislature directed the state treasurer to pay the tax notes and all taxes due; exempted the Grant from any kind of taxes so long as Cornplanter or his heirs held it; provided heavy penalties for trespass on the property; and authorized the appointment of commissioners to interview the old chief and explain the objects of the act. On the sixth day of July, the chief met the state commissioners at Warren and delivered himself of a really good speech—the most eloquent that Warren County has ever heard, I am sure.

"Cornplanter died on February 18, 1836, and letters of administration were issued on May 29, 1837, to Robert Falconer. On August 31, the heirs petitioned the Warren County Orphans Court for a partition of the Grant, and an inquest was awarded. What became of it, I do not know. Perhaps the court, on consideration, decided then what it formally determined later—that it had no jurisdiction. The heirs then living sold and leased parts of it as though it had been divided. Maybe they agreed amongst themselves. In any event, the Act of May 16, 1871, specifically authorized the Warren County Orphans Court to appoint commissioners to make partition on petition of a majority of the heirs. Such a petition was forthcoming, and three Quakers were appointed commissioners on June 10, 1871. It is said that all heirs were represented at the hearing, held in the schoolhouse on August 21. Allotments were made, surveyed, and mapped. On December 5 the findings were confirmed by the court. By this action the Grant was divided and everyone seemed satisfied.

"But the Act of 1871 went further. After partition, the owners were permitted to sell only to descendants of Cornplanter or to other Senecas; and the Grant was again declared exempt from taxes or from any judicial sale except to Senecas.

"This created a peculiar title and an interesting problem, both rather thoroughly explored from the state's standpoint after the death of Marsh Pierce, Cornplanter's grandson, on November 3, 1899. Marsh Pierce was in all respects a remarkable man. The Quakers had done well by his education. He was a builder by trade, and a forward-looking citizen. At his death he left five sons: Gibson, Oakley, Amos, Toppley O'Connell, and Windsor. On December 7, 1908, Gibson, the oldest, asked the Warren County Orphans Court for a partition of the lands amongst the five. On February 13, 1909, the other four alleged that Gibson was not Marsh's son, and the case went to trial. The court appointed a master to take testimony. He interviewed, through an interpreter, some nineteen Indian witnesses, most of them old people. The revelation here of ways of actual Indian life in the middle 1800's makes fascinating reading. The judge found Gibson to be Marsh's son and awarded an inquest to make partition.

"But on June 17, 1911, Amos came into court with a motion to stay proceedings. He contended that the court lacked jurisdiction because all the parties at interest were Indians, not citizens, subject only to the laws of the Seneca Nation, whose quasi-independent existence had been recognized by Congress in 1849; and, besides, that Seneca inheritance is always through the mother's side and white laws do not apply. So the court appointed an auditor to consider all this. Over the

following years two more judges heard the case and all decided that their court had authority in the premises, ordering the allotment to proceed. At one point the case went even to the Superior Court. On November 11, 1921, the estate property was sold for $900 to Gibson Pierce, at the courthouse in Warren.

"At this point an Indian lawyer from the Cattaraugus Reservation stepped in and did such a good job that on November 13, 1922—fourteen years after the start—a fourth judge held all proceedings void, and decided that his court had no jurisdiction, mainly on the ground that he doubted its ability to protect the sheriff of Warren County if the Indians resisted him.

"When the federal authorities came to look into this matter in recent years, in connection with the proposed Allegheny Reservoir, or 'Kinzua Dam,' they concluded that 'insofar as the United States was and is concerned, this (Cornplanter) reservation is individual property over which the United States has no jurisdiction.' The basis for this opinion is outlined in House Document No. 300, 76 Congress, First Session, 1939.

"Just where this leaves the Grant legally it is hard to say. But the Indians get along fairly well just the same. Starting with the 1871 partition, they have recognized as heirs all descendants of Chief Cornplanter, whether the descent be through the mothers' or fathers' line. But one dear old lady rather wishes there were someone to whom she could appeal, because she thinks that a line fence in process of erection is on her land and she cannot find anyone with authority to stop it.

"The Moravian Zeisberger talked religion with the then chief of the Upper Allegheny towns in 1767; and Waterman Baldwin, a teacher, and his Bible were there as early as 1791. But educational and missionary work really started in 1798 with the arrival of three young Quakers from Philadelphia, accompanied by older brethren to set them up in business. Joel Swayne and Halliday Jackson settled down at Old Town, some nine or ten miles above Jennesadaga, where they planned to turn warriors into farmers and artisans. Henry Simmons, Jr., stayed at Jennesadaga with Cornplanter and took over the departments of morals and education. Quakers never prose-

\* \* \* \* \* \*

TRIAL NOTE: At the trial Mr. Merle H. Deardorff—a noted historian—testified on the history of the Cornplanter Tract as outlined in the appendix.